Filed 10/29/14  P. v. Patterson CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, | B250340 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA390544) |
| v. | |
| WILLINA PATTERSON, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of the County of Los Angeles, Laura F. Priver, Judge.  Affirmed.

Steven Schorr, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Steven D. Matthews, Supervising Deputy Attorney General, J. Michael Lehman, Deputy Attorney General, for Plaintiff and Respondent.

## INTRODUCTION

Defendant and appellant Willina Patterson (defendant) was convicted of second degree murder (Pen. Code, § 187, subd. (a)[1]) in connection with her allegedly handing a knife to a codefendant who then stabbed a victim to death during an altercation. Defendant argues that the trial court erred in not sua sponte instructing the jury on voluntary manslaughter on a heat of passion theory; in not sua sponte instructing the jury as to involuntary manslaughter; by instructing the jury with CALCRIM No. 403 because giving an instruction on the natural and probable consequence doctrine without providing manslaughter instructions was confusing and reduced the prosecution's burden of proof; and on imposing consecutive sentences for the charged crime in a pending unrelated matter. We affirm.

## BACKGROUND

### A.     Factual Background

#### 1.     *Prosecution Evidence*

San Julian Park (Park) is located at the corner of Fifth and San Julian Streets. The Union Rescue Mission (Mission) is located near the Park, on San Julian Street, between Fifth and Sixth Streets.

##### a)     Laquinta Stewart Testimony

Stewart testified as follows. Defendant and Melvin Parker (Parker) were in a dating relationship. On July 29, 2011, Stewart saw Parker and Kevivon Brown (Brown) argue at the Park, and they eventually began punching each other. The arguing was loud enough for Stewart to hear it from 44 feet away. Defendant was not present for this fight. Before the fight started, defendant had left the Park and walked down San Julian Street.

---

[1]     All statutory citations are to the Penal Code unless otherwise noted.

When defendant was in the Park, she was just standing around, and was not involved in the fight or argument in the Park. Stewart later testified that defendant was about 10 feet away from the fight in the Park.

The fight ended when Parker walked away, left the Park, and started to walk on San Julian Street. When Parker left the Park, he said, "Don't trip. I'll be back." Brown followed behind Parker, taunting him as he walked away. At that time, defendant was "down the street . . . ahead of" Parker. Parker turned around, and he and Brown resumed arguing. While it was still only a verbal altercation, defendant moved closer to it, removed a knife from her purse, and "slipped the knife" to Parker. Stewart saw that Parker had two to three inches of something shiny that appeared to be a knife in his right hand, and the fight became physical when Parker hit Brown in the face while holding the small metal part of a knife in his hand. While the two men were fighting, defendant said, "Get 'em, get 'em, get 'em," about five or six times. Stewart did not remember whether defendant said "get 'em, get 'em" before Stewart saw the knife. The fight was faster than the first fight, lasting no more than five or six minutes, but Parker and Brown were fighting harder and more aggressively than earlier.

About two minutes after defendant gave Parker the knife Parker stabbed Brown. Stewart then said it was at about that same time that defendant said "get 'em, get 'em." During this fight, defendant seemed angry. Defendant appeared to be instigating the fight by the matter in which she was talking, and seemed particularly argumentative when Brown and Parker were arguing face-to-face.

After the stabbing, defendant took the knife back from Parker and put it in her purse. She said, "Come on, come on. Let's go, let's go. We gotta go," as she headed south on San Julian Street with Parker.

Once the fight ended, Stewart ran to help Brown, who was bleeding on the ground. Brown was grabbing his chest, gasping for air, and said, "I can't believe he stabbed me."

Later that day, Stewart wrote on a photographic identification report that during the stabbing incident she saw Parker "pull[] out a knife and start[] stabbing" Brown Stewart acknowledged her statement made no mention of defendant and did not say

3

defendant handed Parker a knife, but rather that he pulled out a knife. During about the first week of August 2011, Stewart told Los Angeles Police Department Detective Thayer Lake that Stewart did not see the knife in Parker's hand until after the fight was already going on.

b)      Vincent Hall Testimony[2]

Hall testified as follows. Hall saw Parker and defendant walking together going south from Fifth Street on San Julian Street toward the Mission. Brown was near the Mission and he seemed kind of angry, walking back and forth in circles. Parker and defendant approached Brown. As they did so, defendant took an object out of her pocket and passed it to Parker, who reached out and grabbed it from her hand. Parker walked over to Brown, went behind and in front of him, and hit him several times with upper cuts. Using his right hand in a clenched fist, Parker hit Brown in the face, chest, and stomach more than eight times while defendant yelled, "Baby get him. Baby get him." Hall could not see what was in Parker's hand when Parker was hitting Brown. Hall only realized Parker had a knife during the last two of the eight hits, after somebody in the crowd said that Parker had a knife. Then he saw the blade and handle of a small, gray buck knife, about four to five inches in length, in Parker's left hand.

At the end of the fight, Parker walked over to defendant and gave her the knife. Defendant "grab[bed] the knife" and put it in her pocket. Defendant and Parker then left the Mission area. Brown sustained a cut on his eye and knife wounds to his chest and stomach. Brown was bleeding from those wounds.

Hall followed Parker and defendant. Hall saw City of Los Angeles Police Officer Jesus Toris, pointed to Parker and defendant, and told Officer Toris that Parker had just stabbed somebody.

---

[2]      Hall was not available to testify at trial. His November 28, 2012, testimony, given at defendant's prior trial, was read into the record.

During Hall's interview with Officer Toris the day of the incident, Hall said he saw defendant leave with Parker but did not say that he saw defendant hand Parker anything, or that he heard defendant say anything during the fight. Hall testified that if he did not mention seeing defendant hand Parker an object it was because that detail "slipped [his] mind."

Hall initially testified that about one week after the incident, he met with Detective Lake and told him that he saw defendant hand Parker a small gray object. He then clarified that he did see her do that but he did not initially tell Lake about it because it "slipped [his] mind."

c)     Yola Montgomery Testimony

Montgomery testified as follows. The stabbing incident occurred near an area of the Mission where a stationary camera was located. A videotape of the stabbing incident was played for the jury. Montgomery confirmed that the videotape accurately reflected the events that occurred during the incident.

On July 29, 2011, Montgomery was near the Mission talking with her daughter and Brown. Montgomery walked away from the conversation, and saw Brown again about 20 to 30 minutes later. Parker and defendant were walking close together going southbound from Fifth Street. Defendant was carrying a brown or black purse.

Parker approached Brown, who was sitting down, and started hitting him. Brown got up and the two started fighting. At first, Parker was just punching Brown. At some point during the fight, however, Parker "received a knife" and about two minutes into the fight, Parker stabbed Brown, and she saw blood. At first, Montgomery testified she did not see defendant hand a knife to Parker. Montgomery had told an investigator she saw defendant pull out the knife and hand it to Parker. Parker stabbed Brown eight times, including his upper left chest, the side of his rib cage, his back, and on his right side.

Montgomery confirmed that she did not actually see defendant hand an object to Parker. Before the incident, defendant had something in her hand, but Montgomery could not see what it was. Montgomery saw defendant standing two feet behind Parker

5

during the fight. Because Montgomery's back was turned at the time Parker received the knife, she did not see or know specifically where he got it, but Montgomery knew that Parker had received one because Montgomery saw it in his hands, and after he stabbed Brown Parker dropped it on the ground and picked it up.

After the stabbing incident, defendant said "come on, let's go," and Parker put the knife in his left side jacket pocket. Defendant and Parker walked away together going southbound on Sixth Street. After they walked away, Brown fell down on the sidewalk, and started gushing out blood. Someone called 911. The responding officer said "dead on arrival," and had everybody move back.

When interviewed the day of the incident, Montgomery told Officer Toris that she saw Parker produce a knife. She did not say that she saw defendant hand Parker anything or hear defendant say anything during the fight. About one week after the incident, Montgomery told Detective Lake that defendant did not do anything during the stabbing incident.

#### d) Physical Evidence

The day after the stabbing incident, officers located defendant and Parker in a motel about 10 to 15 miles away from the Mission. Parker and defendant eventually exited the room, and no one else came out after that.

The officers then entered and searched the room. They observed blood splatter in the bathroom area and a number of items on the bed, including a black purse.

A knife sheath was found in the purse; the police did not find a knife in the purse. A DNA analysis of a blood stain located on the purse indicated that it matched Brown's blood.

A bill of sale for a vehicle also was found in the purse. The license plate number on the bill of sale corresponded to the license plate number on a car parked directly in front of the motel room that had been occupied by defendant and Parker. On the back seat of the car the officers found a black bag containing blood-spattered jeans and a T-

6

shirt, that were consistent with clothing worn by the stabber depicted in the surveillance video.

### e) The Autopsy

Deputy medical examiner Vadims Poukens performed an autopsy on Brown, whose medical history indicated that he had suffered multiple stab wounds. Examiner Poukens documented 20 scars on Brown's body, most of which were consistent with healing stab wounds. Examiner Poukens opined the cause of Brown's death was complications due to multiple stab wounds.

### 2. *Defendant's Evidence*

Defendant did not testify and presented no testimony on her behalf.

## B. Procedural Background

The District Attorney of Los Angeles County filed an information charging defendant with murder in violation of section 187, subdivision (a). The District Attorney further alleged that defendant had served a prior prison term under section 667.5, subdivision (b).

Defendant was first tried with Parker. Parker was convicted of second degree murder, but the jury remained deadlock as to defendant, and a mistrial was declared as to her. Following a second trial, the jury found defendant guilty on second degree murder. The trial court denied probation and sentenced defendant to state prison for a term of 15 years to life, along with a consecutive seven-year term in an unrelated case.

The trial court awarded defendant custody credit, and ordered her to pay various fees, fines and penalties. Defendant filed a timely notice of appeal.

## DISCUSSION

### A.     Sua Sponte Instructions on Lesser Included Offenses

Defendant contends that the trial court erred by not instructing the jury sua sponte on the lesser included offenses of voluntary and involuntary manslaughter. Defendant argues that the trial court should have instructed the jury on voluntary manslaughter because there was evidence that she acted based on a sudden quarrel or heat of passion, and it should have instructed the jury on involuntary manslaughter because the jury could find that defendant only intended to aid in a simple unarmed assault and that Brown's death was not reasonably foreseeable and not the natural and probable consequence of a simple assault.

#### 1.     *Standard of Review*

"We apply the independent or de novo standard of review to the failure by the trial court to instruct on an assertedly lesser included offense. [Citation.]" (*People v. Cole* (2004) 33 Cal.4th 1158, 1218.)

#### 2.     *Applicable Law*

"In criminal cases, even absent a request, the trial court must instruct on general principles of law relevant to the issues raised by the evidence. [Citation.] This obligation includes giving instructions on lesser included offenses when the evidence raises a question whether all the elements of the charged offense were present, but not when there is no evidence the offense was less than that charged. [Citation.]" (*People v. Koontz* (2002) 27 Cal.4th 1041, 1085.) "[T]he existence of '*any* evidence, no matter how weak' will not justify instructions on a lesser included offense, but such instructions are required whenever evidence that the defendant is guilty only of the lesser offense is 'substantial enough to merit consideration' by the jury. [Citations.] 'Substantial evidence' in this context is "'evidence from which a jury composed of reasonable [persons] could . . . conclude[ ]'" that the lesser offense, but not the greater, was committed. [Citations.]"

(*People v. Breverman* (1998) 19 Cal.4th 142, 162; *People v. Barton* (1995) 12 Cal.4th 186, 200-201 [a trial court need instruct on a lesser included offense only when there is substantial evidence, "not when the evidence is 'minimal and insubstantial'"].)

"'Murder is the unlawful killing of a human being . . . with malice aforethought.' [Citation.] 'Such malice may be express or implied. It is express when there is manifested a deliberate intention unlawfully to take away the life of a fellow creature. It is implied, when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart.' [Citation.] 'Murder that is committed with malice but is not premeditated is of the second degree.' [Citations.]" (*People v. Prince* (2007) 40 Cal.4th 1179, 1265-1266.) "Malice will be implied 'when the killing results from an intentional act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life. [Citations.]' [Citations.]" (*People v. Taylor* (2010) 48 Cal.4th 574, 623-624.)

Section 31 provides, "All persons concerned in the commission of a crime . . . whether they directly commit the act constituting the offense, or aid and abet in its commission, . . . are principals in any crime so committed." "[A]n aider and abettor's liability for criminal conduct is of two kinds. First, an aider and abettor with the necessary mental state is guilty of the intended crime. Second, under the natural and probable consequences doctrine, an aider and abettor is guilty not only of the intended crime, but also 'for any other offense that was a "natural and probable consequence" of the crime aided and abetted.' [Citation.]" (*People v. McCoy* (2001) 25 Cal.4th 1111, 1117.) "[A] defendant whose liability is predicated on his status as an aider and abettor need not have intended to encourage or facilitate the particular offense ultimately committed by the perpetrator. His knowledge that an act which is criminal was intended, and his action taken with the intent that the act be encouraged or facilitated, are sufficient to impose liability on him for any reasonably foreseeable offense committed as a consequence by the perpetrator. It is the intent to encourage and bring about conduct that is criminal, not the specific intent that is an element of the target offense, which . . . must

9

be found by the jury. [Citation.]" (*People v. Croy* (1985) 41 Cal.3d 1, 12, fn. 5; see *People v. Chiu* (2014) 59 Cal.4th 155, 161-162.)

The Supreme Court recently observed, "[W]e have never held that the application of the natural and probable consequences doctrine depends on the foreseeability of every element of the nontarget offense. Rather, in the context of murder under the natural and probable consequences doctrine, cases have focused on the reasonable foreseeability of the actual resulting harm or the criminal act that caused that harm. [Citations.]" (*People v. Chiu, supra,* 59 Cal.4th at p. 165, fn. omitted.) The court said, however, it had not been called upon in prior cases to "decide whether all of the elements of the nontarget offense must be foreseeable." (*Id.* at p. 165, fn. 3.)

The court added, "In the context of murder, the natural and probable consequences doctrine serves the legitimate public policy concern of deterring aiders and abettors from aiding or encouraging the commission of offenses that would naturally, probably, and foreseeably result in an unlawful killing. A primary rationale for punishing such aiders and abettors—to deter them from aiding or encouraging the commission of offenses—is served by holding them culpable for the perpetrator's commission of the nontarget offense of second degree murder. (*People v. Knoller* (2007) 41 Cal.4th 139, 143, 151-152 [59 Cal.Rptr.3d 157, 158 P.3d 731] [second degree murder is the intentional killing without premeditation and deliberation or an unlawful killing proximately caused by an intentional act, the natural consequences of which are dangerous to life, performed with knowledge of the danger and with conscious disregard for human life].) It is also consistent with reasonable concepts of culpability. Aider and abettor liability under the natural and probable consequences doctrine does not require assistance with or actual knowledge and intent relating to the nontarget offense, nor subjective foreseeability of either that offense or the perpetrator's state of mind in committing it. (*People v. Nguyen* (1993) 21 Cal.App.4th 518, 531 [26 Cal.Rptr.2d 323] [inquiry is strictly objective and does not depend on defendant's subjective state of mind].) It only requires that under all of the circumstances presented, a reasonable person in the defendant's position would have or should have known that the nontarget offense was a reasonably foreseeable

10

consequence of the act aided and abetted by the defendant.  (*Ibid*.)  [¶] . . . [¶]  Accordingly, we hold that punishment for second degree murder is commensurate with a defendant's culpability for aiding and abetting a target crime that would naturally, probably, and foreseeably result in a murder under the natural and probable consequences doctrine."  (*People v. Chiu, supra,* 59 Cal.4th at pp. 165-166.)  In *People v. Chiu, supra,* 59 Cal.4th at page 166, the court held that a defendant would not be convicted under the natural and probable consequences doctrine for a first degree murder, although aiders and abettors may be convicted of first degree murder based on direct aiding and abetting principles.

"'California statutes have long separated criminal homicide into two classes, the greater offense of murder and the lesser included offense of manslaughter.'"  (*People v. Martinez* (2007) 154 Cal.App.4th 314, 335.)  "Voluntary and involuntary manslaughter are lesser included offenses of murder.  [Citations.]"  (*People v. Thomas* (2012) 53 Cal.4th 771, 813.)

"''"A defendant who commits an intentional and unlawful killing but who lacks malice is guilty of . . . voluntary manslaughter.  [Citation.]"  [Citation.]'"  (*People v. Rios* (2000) 23 Cal.4th 450, 460.)  Except for acts committed in the driving of a vehicle, involuntary manslaughter is "the commission of an unlawful act, not amounting to felony; or in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection."  (§ 192, subd. (b).)  "[W]here involuntary manslaughter is predicated on an unlawful act constituting a misdemeanor, it must still be shown that such misdemeanor was dangerous to human life or safety under the circumstances of its commission."  (*People v. Cox* (2000) 23 Cal.4th 665, 675.)

### 3. *Relevant Proceedings*

#### a) The Prosecution's Theory of the Case and the Defense

The prosecution's theory of the case was that defendant was guilty of murder because she handed Parker a knife with either the intent that Parker use it to kill Brown,

11

or with the intent that Parker used it to stab Brown and the natural and probable consequence of an assault with a knife was Brown's murder. During closing arguments, for example, the prosecutor argued that defendant was guilty of murder by aiding and abetting Brown's murder by handing Parker a knife with the intent that he use it to murder Brown. The prosecutor stated, "They walk up together to confront Mr. Brown and the defendant slides Mr. Parker a knife. Mr. Parker stabs Mr. Brown resulting in Mr. Brown dying. All the while the defendant's saying, 'get him, get him, baby get him,' two times, maybe more depending on who it was that heard it, and takes the knife right back after the stabbing is over. [¶] What does that equal? You have only one reasonable conclusion from that. [Defendant] intended for Mr. Parker to use the knife to kill Mr. Brown and but for her actions it would have been a fist fight."

The prosecutor presented a second theory of liability to the jury based on the natural and probable consequences of aiding and abetting a knife attack, stating, "But some of you may be thinking, Mr. Prosecutor maybe [defendant] only gave Mr. Parker the knife to cut [him] a little bit. Maybe she didn't intend or share the intent with Mr. Parker to murder Mr. Brown. She's still guilty of murder. [¶] . . . [¶] During the assault Parker commits the crime of murder which the evidence proved and . . . under all the circumstances a reasonable person would have known that murder is a natural and probable consequence of that assault. [¶] Let's think about it. It's an assault with a knife. Of course common sense can tell you[,] stab someone with a knife, you attack somebody with a knife what's going to happen[?]"

Defendant's theory of the case was that there was insufficient evidence that she was the one who provided the knife to Parker and that the witnesses who testified about her giving to the knife to Parker lacked credibility. During closing arguments, for example, defendant's counsel argued that there were inconsistencies in some of the witnesses' testimony regarding the knife, and asked the jury, "Did the prosecution prove to you that [defendant] actually handed Mr. Parker a knife?"

12

b)    Instructions Given to the Jury

The trial court instructed the jury with a modified version of CALCRIM No. 520, stating, "The defendant is charged in Count 2 with murder in violation of Penal Code section 187.  To prove the defendant is guilty of this crime the People must prove that number 1 the defendant committed an act that caused the death of another person; and 2, when the defendant acted she had a state of mind called malice aforethought.  [¶]  There are two kinds of malice aforethought, express malice and implied malice.  Proof of either is sufficient to establish the state of mind required for murder.  [¶]  The defendant acted with express malice if she unlawfully intended to kill; the defendant acted with implied malice if number 1 [she] intentionally committed an act; 2, the natural and probable consequences of the act were dangerous to human life; and number 3 at the time she acted, she knew her act was dangerous to human life; and 4, she deliberately acted with conscious disregard for human life.  [¶]  Malice aforethought does not require hatred or ill will toward the victim.  It is a mental state that must be formed before the act that causes death is committed.  It does not require deliberation or the passage of any particular period of time.  [¶]  An act causes death if the death is the direct, natural, and probable consequence of the act and the death would not have happened without the act.  A natural and probable consequence is one that a reasonable person would know is likely to happen if nothing unusual intervenes.   [¶]  In deciding whether a consequence is natural and probable, consider all of the circumstances established by the evidence.  [¶]  There may be more than one cause of death.  An act causes death only if it is a substantial factor in causing death.  A substantial factor is more than a trivial or remote factor however it does not need to be the only factor that causes death.  If you decide the defendant is guilty of murder, it is murder of the second degree."

The trial court instructed the jury with a modified version of CALCRIM No. 400, stating, "A person may be guilty of a crime in two ways.  1, he or she may have directly committed the crime.  I will call that person the perpetrator; 2, he or she may have aided and abetted a perpetrator who directly committed the crime.  A person is guilty of a crime whether he or she committed it personally or aided [and] abetted the perpetrator."  The

13

trial court continued to instruct the jury with a modified version of CALCRIM No. 401, stating, "To prove that the defendant is guilty of a crime based upon aiding and abetting that crime the People must prove that number 1, the perpetrator committed the crime; number 2, the defendant knew the perpetrator intended to commit the crime; 3, before or during the commission of the crime, the defendant intended to aid and abet the perpetrator in committing the crime and number 4, the defendant's words or conduct did in fact aid and abet the perpetrator's commission of the crime.  [¶]  One aids and abets a crime if he or she knows of the perpetrator's unlawful purpose and he or she specifically intends to and does in fact aid to and does facilitate, promote, encourage, [or] instigate the perpetrator's commission of that crime.  [¶]  If all of these requirements are proved, the defendant does not need to actually have been present when the crime was committed to be guilty as an aider and abettor.  If you conclude the defendant was present at the scene of the crime or failed to prevent the crime, you may consider that fact in determining whether the defendant was an aider and abettor.  However, the fact a person is present at the scene of a crime or fails to prevent the crime does not, by itself, make him or her an aider and abettor."

As discussed below, over the objection of defendant's counsel, the trial court instructed the jury with a modified version of CALCRIM No. 403, stating, "Before you may decide whether the defendant is guilty of murder you must decide whether she is guilty of assault.  To prove the defendant is guilty of assault [*sic*][3] the People must prove that 1, the defendant is guilty of assault; 2, during the commission of assault a coparticipant in that assault committed the crime of murder; and 3 under all the circumstances a reasonable person in the defendant's position would have known the commission of the murder was a natural and probable consequence of the commission of the assault.  [¶]  A coparticipant in the crime includes the perpetrator or anyone who aided, abetted the perpetrator.  It does not include a victim or innocent bystander.  [¶]  A

---

[3]     As noted below, defendant correctly states that the trial court should have used the term "murder" instead of 'assault."

14

natural and probable consequence is one that a reasonable person would know is likely to happen if nothing unusual intervenes. [¶] In deciding whether a consequence is natural and probable, consider all of the circumstances established by the evidence. If the murder was committed for a reason independent of the common plan to commit the assault then the commission of murder was not a natural and probable consequence of the assault. [¶] To decide whether crime of assault [*sic*][4] was committed, please refer to the separate instructions I will give you on that crime."

The trial court also instructed the jury on assault with a deadly weapon pursuant to a modified version of CALCRIM No. 875, stating, "To prove the defendant is guilty of assault with a deadly weapon the People must prove that number 1 the defendant did an act with a deadly weapon other than a firearm that by its nature would directly and probably result in the application of force to a person; 2, the defendant did that act willfully. When the defendant acted she was aware of facts that would lead a reasonable person to realize that her act by its nature would directly and probably result in the application of force to someone. When the defendant acted she had the present ability to apply force with a deadly weapon other than a firearm to a person. One commits an act willfully when he or she does it willingly or on purpose. It is not required that he or she intend to break the law, hurt someone else, or gain any advantage. [¶] The term[s] application of force and apply force mean to touch in a harmful or offensive manner. The slightest touching can be enough if it is done in a rude or angry way. Making contact with another person including through his or her clothing, is enough. The touching does not have to cause pain or injury of any kind. The touching can be done indirectly by causing an object or someone else to touch the other person. [¶] The People are not required to prove the defendant actually touched someone. The People are not required to prove the defendant actually intended to use force against someone when she acted. [¶] No one needs to actually have been injured by the defendant's act but if someone was injured, you may consider that fact along with all the other evidence in

---

**4** As noted below, defendant also correctly states that the trial court should have used the term "murder" instead of 'assault" here also.

deciding whether the defendant committed an assault. [¶] A deadly weapon other than a firearm is any object, instrument, or weapon that is inherently deadly or dangerous or one that is used in such a way that it is capable of causing and likely to cause death or great bodily injury."

### c) Manslaughter Jury Instructions Not Given

Defendant contends that the trial court should have instructed the jury with manslaughter instructions. CALCRIM No. 570 instructs the jury on heat of passion. It states, "A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed someone because of a sudden quarrel or in the heat of passion. [¶] The defendant killed someone because of a sudden quarrel or in the heat of passion if: [¶] 1. The defendant was provoked; [¶] 2. As a result of the provocation, the defendant acted rashly and under the influence of intense emotion that obscured (his/her) reasoning or judgment; [¶] AND [¶] 3. The provocation would have caused a person of average disposition to act rashly and without due deliberation, that is, from passion rather than from judgment. [¶] Heat of passion does not require anger, rage, or any specific emotion. It can be any violent or intense emotion that causes a person to act without due deliberation and reflection. [¶] In order for heat of passion to reduce a murder to voluntary manslaughter, the defendant must have acted under the direct and immediate influence of provocation as I have defined it. While no specific type of provocation is required, slight or remote provocation is not sufficient. Sufficient provocation may occur over a short or long period of time. [¶] It is not enough that the defendant simply was provoked. The defendant is not allowed to set up (his/her) own standard of conduct. You must decide whether the defendant was provoked and whether the provocation was sufficient. In deciding whether the provocation was sufficient, consider whether a person of average disposition, in the same situation and knowing the same facts, would have reacted from passion rather than from judgment. [¶] [If enough time passed between the provocation and the killing for a person of average disposition to 'cool off' and regain his or her clear reasoning and judgment, then the killing is not

16

reduced to voluntary manslaughter on this basis.] [¶] The People have the burden of proving beyond a reasonable doubt that the defendant did not kill as the result of a sudden quarrel or in the heat of passion. If the People have not met this burden, you must find the defendant not guilty of murder."

CALCRIM No. 580 provides, "When a person commits an unlawful killing but does not intend to kill and does not act with conscious disregard for human life, then the crime is involuntary manslaughter. [¶] The difference between other homicide offenses and involuntary manslaughter depends on whether the person was aware of the risk to life that his or her actions created and consciously disregarded that risk. An unlawful killing caused by a willful act done with full knowledge and awareness that the person is endangering the life of another, and done in conscious disregard of that risk, is voluntary manslaughter or murder. An unlawful killing resulting from a willful act committed without intent to kill and without conscious disregard of the risk to human life is involuntary manslaughter. [¶] The defendant committed involuntary manslaughter if: [¶] 1. The defendant committed (a crime/ [or] a lawful act in an unlawful manner); [¶] 2. The defendant committed the (crime/ [or] act) with criminal negligence; [¶] AND [¶] 3. The defendant's acts caused the death of another person. [¶] [The People allege that the defendant committed the following crime[s]: _____ <insert misdemeanor[s]/infraction[s])/noninherently dangerous (felony/felonies)>. [¶] Instruction[s] _____ tell[s] you what the People must prove in order to prove that the defendant committed _____ <insert misdemeanor[s]/infraction[s])/ noninherently dangerous (felony/felonies)>.] [¶] [The People [also] allege that the defendant committed the following lawful act[s] with criminal negligence: _____ <insert act[s] alleged>.] [¶] Criminal negligence involves more than ordinary carelessness, inattention, or mistake in judgment. A person acts with criminal negligence when: [¶] 1. He or she acts in a reckless way that creates a high risk of death or great bodily injury; [¶] AND [¶] 2. A reasonable person would have known that acting in that way would create such a risk. [¶] In other words, a person acts with criminal negligence when the way he or she acts is so different

17

from the way an ordinarily careful person would act in the same situation that his or her act amounts to disregard for human life or indifference to the consequences of that act. [¶] [An act causes death if the death is the direct, natural, and probable consequence of the act and the death would not have happened without the act. A natural and probable consequence is one that a reasonable person would know is likely to happen if nothing unusual intervenes. In deciding whether a consequence is natural and probable, consider all of the circumstances established by the evidence.] [¶] [There may be more than one cause of death. An act causes death only if it is a substantial factor in causing the death. A substantial factor is more than a trivial or remote factor. However, it does not need to be the only factor that causes the death.] [¶] Great bodily injury means significant or substantial physical injury. It is an injury that is greater than minor or moderate harm. [¶] [The People allege that the defendant committed the following (crime[s]/ [and] lawful act[s] with criminal negligence): _____ <insert alleged predicate acts when multiple acts alleged>. You may not find the defendant guilty unless all of you agree that the People have proved that the defendant committed at least one of these alleged acts and you all agree that the same act or acts were proved.] [¶] In order to prove murder or voluntary manslaughter, the People have the burden of proving beyond a reasonable doubt that the defendant acted with intent to kill or with conscious disregard for human life. If the People have not met either of these burdens, you must find the defendant not guilty of murder and not guilty of voluntary manslaughter."

### 4. Analysis

#### a) Voluntary Manslaughter

Defendant contends that the trial court erred because it failed to instruct, sua sponte, the jury as to voluntary manslaughter on a heat of passion theory. A killing "upon a sudden quarrel or heat of passion" is voluntary manslaughter. (§ 192, subd. (a).) If there is sufficient provocation and a defendant acts on a sudden quarrel or heat of passion, malice is presumed to be absent. (*People v. Lee* (1999) 20 Cal.4th 47, 59.)

18

Because heat of passion reduces an intentional, unlawful killing from murder to voluntary manslaughter by negating the element of malice, heat of passion voluntary manslaughter is a lesser necessarily included offense of intentional murder. (*People v. Breverman, supra,* 19 Cal.4th at p. 154.) When there is substantial evidence of a lesser included offense, such as manslaughter, the trial court has a duty to instruct on it. (*Id.* at p. 162.)

Defendant argues that she knew Parker was under the heat of passion because a witness testified she was present at the first fight between Parker and Brown, and even if she was not present, the jury reasonably could find that she knew of the earlier altercation between Parker and Brown because there was evidence the first fight was loud and she was with Parker when Brown taunted him. According to defendant, a jury therefore reasonably could find that she aided and abetted an assault, and knowing that Parker was under the heat of passion, the natural and probable consequences of the assault therefore would only be voluntary manslaughter. Defendant, however, does not cite to any authority, nor are we aware of any, that the trial court errs if it does not instruct on another's heat of passion so as to permit the jury to determine if the natural and probable consequences of an assault is voluntary manslaughter and not murder.

In addition, "'The provocation which incites the defendant to homicidal conduct in the heat of passion must be caused by the victim [citation], or be conduct reasonably believed by the defendant to have been engaged in by the victim.' [Citation.]'" (*People v. Verdugo* (2010) 50 Cal.4th 263, 293.) Defendant relies on evidence concerning Brown's purported provocation of Parker: The first fight in which they were engaged was loud, and after the first fight, Brown followed behind Parker and taunted him. Defendant, however, may not premise her entitlement to a heat of passion instruction on the theory that Parker killed Brown while under the heat of passion. (*People v. McCoy*, *supra*, 25 Cal.4th at pp. 1120-1122.) "Aider and abettor liability is premised on the combined acts of all the principals, but on the aider and abettor's own mens rea. If the mens rea of the aider and abettor is more culpable than the actual perpetrator's, the aider and abettor may be guilty of a more serious crime than the actual perpetrator." (*Id.* at p. 1120.)

19

There also is not substantial evidence that Brown's purported provocation of Parker or defendant would cause a reasonable person to act rashly and without deliberation and reflection, or otherwise to kill Brown. The test of whether there is sufficient provocation or heat of passion such that it can negate malice and thereby reduce murder to voluntary manslaughter is objective. (*People v. Steele* (2002) 27 Cal.4th 1230, 1253.) The victim's provocative conduct "must be sufficiently provocative that it would cause an ordinary person of average disposition to act rashly or without due deliberation and reflection. [Citations.] 'Heat of passion arises when "at the time of the killing, the reason of the accused was obscured or disturbed by passion to such an extent as would cause the ordinarily reasonable person of average disposition to act rashly and without deliberation and reflection, and from such passion rather than from judgment."' [Citation.]" (*People v. Lee*, *supra*, 20 Cal.4th at p. 59.) The heat of passion must be such that it would be aroused naturally in an ordinarily reasonable person in the same circumstances. (CALJIC No. 8.42.)

The trial court did not err by not instructing the jury, sua sponte, as to voluntary manslaughter. The issue is whether defendant presented sufficient evidence of her own mens rea. Defendant's defense was premised on the theory that she did not give the knife to Parker.

Defendant did not present any evidence that she was acting under a heat of passion—the subjective prong of voluntary manslaughter. (See *People v. Lee, supra,* 20 Cal.4th at p. 49.) The evidence shows that she and Parker approached Brown in connection with the fatal altercation. And there was no evidence that the provocation would cause a person to react with deadly passion—the objective prong of voluntary manslaughter. (*People v. Hernandez* (2010) 183 Cal.App.4th 1331, 1332.) Defendant contends that the trial court should have instructed the jury as to manslaughter on the basis that the jury could have determined that she aided and abetted a lawful act because she intended to give the knife to Parker to use for self defense purposes only. There however is no substantial evidence upon which a jury could find that she intended to give the knife to Parker to use for self defense purposes.

20

b)    Involuntary Manslaughter

Defendant also contends that the trial court should have instructed the jury as to manslaughter, because, according to defendant, the jury could have determined that she aided and abetted a simple unarmed assault by encouraging it (i.e., saying "get him" to Parker), and defendant's act of encouraging that simple unarmed assault was dangerous to human life under the circumstances of its commission. (*People v. Cox*, *supra,* 23 Cal.4th at p. 675.) Although a simple assault can support liability for murder under the natural and probable consequences theory (*People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 297-300), the prosecution did not proceed under such a theory, and defendant does not show how she would be liable under such a case.

There is conflicting evidence on whether defendant gave Parker the knife. If defendant gave Parker the knife, she obviously knew that he had one. There also is evidence from which a jury could infer that even if she did not give the knife to Parker, she knew he had one. There is evidence that defendant and Parker were in a dating relationship for several months or perhaps a year. It is undisputed that defendant was present when the stabbing incident occurred, and defendant was described as being "kind of close" to Parker during the altercation. Others in attendance at the knifing incident saw that Parker had a knife, and it is undisputed, and indeed defendant concedes, that Parker stabbed Brown during the altercation. In addition, after the stabbing incident, a knife sheath was found in a purse that matched the description of the purse Montgomery said defendant was carrying immediately before the incident. That purse was located on the bed of a room vacated by defendant and Parker.

Although there is substantial evidence that defendant gave Parker the knife, and substantial evidence upon which a reasonable jury could find that defendant knew that Parker had a knife, such that defendant was aiding an assault with a deadly weapon, there is not substantial evidence that she did not know that Parker had a knife and merely aided and abetted a simple unarmed assault. In addition, the jury was instructed on assault with

21

deadly weapon (CALRIM No. 875), and not on simple assault (CALRIM No. 915). The trial court did not err in not instructing the jury as to manslaughter.

### c) Federal Constitutional Right

Defendant did not raise at trial any federal constitutional claim or the failure to instruct the jury on lesser included offenses. By failing to raise this claim with the trial court, defendant has forfeited it. (See *United States v. Olano* (1993) 507 U.S. 725, 731.) Moreover, failure to give a sua sponte instruction on lesser included offenses may be a violation of state law but not a federal constitutional error. (*People v. Moye* (2009) 47 Cal.4th 537, 563; *People v. Breverman, supra,* 19 Cal.4th at pp. 165, 178.)

### B. CALCRIM No. 403

Defendant contends that the trial court erred by instructing the jury with CALCRIM No. 403. We disagree.

### 1. *Discussions Regarding Jury Instructions CALCRIM No. 403*

During the parties' discussion of the jury instructions with the trial court, defendant's counsel objected to CALCRIM No. 403. Defendant's counsel argued that the instruction was confusing under the facts of this case "because it specifically starts out by saying 'before you may decide whether the defendant is guilty of murder you must decide whether she was guilty of assault.' Because I presume that he's relying on the same conduct as an aiding and abetting theory to murder, I don't necessarily think that this is necessary." The prosecutor said, "[T]he evidence supports that theory and while the jury instruction may appear confusing, it does reflect the state of the law and I will try . . . my best to explain it to them during my closing and the jury can rely on the theory to convict in this case." The trial court agreed that the instruction could be confusing, but said that it agreed with the prosecutor that it was "an alternative theory for murder and . . . an accurate statement of the law and I will give it."

CALCRIM No. 403 generally is a correct statement of the law. (*People v. Canizalez* (2011) 197 Cal.App.4th 832, 849.) Defendant claims the instruction is confusing because evidence supported both a direct aider and abettor theory and a natural and probable consequences theory; and the instruction did not specify what had to be found in terms of directly aiding or abetting Parker or her mental state. Added to the confusion, according to defendant, was the reference to the nontarget offense of murder as being the target offense of assault.

### 2.    *Analysis*

Defendant contends that the trial court erred in instructing the jury with CALCRIM No. 403 without instructing the jury on manslaughter because it "was unnecessary, confusing, and enabled the jury to find [defendant] vicariously liable for murder without requiring it" to find what defendant did to aid and abet Parker, or defendant's mental state at the time she acted. Defendant failed to raise her contention that CALCRIM No. 403 should have been modified to allow the jury to find defendant guilty of manslaughter. She instead objected to CALCRIM No. 403 on the grounds that it was "confusing" because the same evidence supported criminal liability under both a "direct" aider and abettor theory and a natural and probable consequences theory. Defendant therefore forfeited her contention. "A party may not raise an argument on appeal that he or she did not raise before the trial court." (*People v. Mayham* (2013) 212 Cal.App.4th 847, 856.) "The law generally requires . . . a *specific* objection . . . to preserve an issue for appeal." (*People v. Smith* (1998) 64 Cal.App.4th 1458, 1468; *People v. Lopez* (2011) 198 Cal.App.4th 1106, 1118-1119 [a challenge to jury instruction that was generally accurate was forfeited for failure to seek modification or clarification].) "Generally, ""[a] party may not complain on appeal that an instruction *correct in law* and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language."" [Citation.] [¶]. . . [¶] The . . . failure [of CALCRIM No. 403] to state that the aider and abettor could also be guilty of vehicular manslaughter on the natural and probable consequences theory

23

made the instruction, at most, incomplete in the context of this case, not incorrect. Therefore, [the defendant] was required to request clarification or modification of this instruction to add that [defendants] could alternatively be guilty of involuntary manslaughter as a natural and probable consequence of the target offense. Having failed to do so, he forfeited this contention as to CALCRIM No. 403." (*People v. Canizalez*, *supra*, 197 Cal.App.4th at p. 849.)

Even if defendant did not forfeit her contention that CALCRIM No. 403 should have been modified to allow the jury to find defendant guilty of manslaughter, the trial court did not err in instructing the jury with CALCRIM No. 403. As noted above, CALCRIM No. 403 is a correct statement of the law (*People v. Canizalez*, *supra*, 197 Cal.App.4th at p. 849) and the trial court did not err in not instructing the jury on the lesser included offenses of voluntary and involuntary manslaughter.

Describing it as an "ancillary" contention, defendant also argues that CALCRIM No. 403 was "technically flawed" because it referred to "the uncharged target of assault at two points where the instruction should refer to the charged, non-target offense of murder" and this "compounded the . . . problem" of not requiring the jury to find what defendant did to aid and abet Parker, or defendant's mental state at the time she acted. Because the trial court did not err in not instructing the jury on the lesser included offenses of manslaughter, there is no problem to compound. Moreover, the trial court's uses the wrong nontarget offense benefitted defendant by suggesting she might be convicted of assault even if murder was the nontarget crime.

## C.     Sentencing

Defendant contends that the trial court abused its discretion in imposing on her consecutive sentences for the instant crime and an unrelated matter. Defendant argues that it was irrational for the trial court to base its decision to do so on her escalating level of violence during a short period of time, and her having already received a light sentence in that unrelated case by being allowed to plead guilty to assault, despite the fact that the victim died. Defendant also contends that the trial court did not exercise informed

discretion because the probation report regarding case number BA387255, considered by the trial court in sentencing defendant, erroneously referred to the victim in that matter as being 5 years old instead of 55 years old.

### 1.      *Standard of Review*

A trial court's imposition of consecutive terms is reviewed for an abuse of discretion.  (*People v. Leon* (2010) 181 Cal.App.4th 452, 468.)  The trial court's sentence "must be affirmed unless there is a clear showing the sentence choice was arbitrary or irrational."  (*People v. Lamb* (1988) 206 Cal.App.3d 397, 401.)  "'In the absence of . . . a showing [that the sentence choice was arbitrary or irrational], the trial court is presumed to have acted to achieve legitimate sentencing objectives, and its discretionary determination to impose a particular sentence will not be set aside on review.'  [Citation.] Concomitantly, '[a] decision will not be reversed merely because reasonable people might disagree.  "An appellate tribunal is neither authorized nor warranted in substituting its judgment for the judgment of the trial judge." [Citations.]' [Citation.]" (*People v. Superior Court* (*Alvarez*) (1997) 14 Cal.4th 968, 977-978.)

### 2.      *Applicable Law*

Section 669, subdivision (a) provides in pertinent part, "When a person is convicted of two or more crimes, whether in the same proceeding or court or in different proceedings or courts, . . . , the second or other subsequent judgment upon which sentence is ordered to be executed shall direct whether the terms of imprisonment or any of them to which he or she is sentenced shall run concurrently or consecutively." California Rules of Court, rule 4.425 provides, "Criteria affecting the decision to impose consecutive rather than concurrent sentences include:  (a) Facts relating to the crimes, including whether or not:  [¶]  (1) The crimes and their objectives were predominantly independent of each other; [¶]  (2) The crimes involved separate acts of violence or threats of violence;  or  [¶]  (3) The crimes were committed at different times or separate places, rather than being committed so closely in time and place as to indicate a single

25

period of aberrant behavior.  [¶]  (b) Any circumstances in aggravation or mitigation may be considered in deciding whether to impose consecutive rather than concurrent sentences, except: [¶]  (1) A fact used to impose the upper term;  [¶]  (2) A fact used to otherwise enhance the defendant's prison sentence; and [¶]  (3) A fact that is an element of the crime may not be used to impose consecutive sentences."  "[T]he trial court is entitled to look at the whole record in the case" (*People v. Fulton* (1979) 92 Cal.App.3d 972, 976), including "'attendant facts,' 'the surroundings at the commission of an act,' [and] 'practically everything which has a legitimate bearing' on the matter in issue." (*People v. Guevara* (1979) 88 Cal.App.3d 86, 93.)

### 3.    Relevant Proceedings

At the sentencing hearing, defendant's counsel advised the trial court that pursuant to a plea agreement in another case, defendant was presently serving a seven-year state prison term sentence.  Defendant pled guilty in case number BA387255 to assault with a deadly weapon other than a firearm or with force likely to produce great bodily injury in violation of section 245, subdivision (a)(1), and she admitted an allegation she personally inflicted great bodily injury within the meaning of section 12022.7, subdivision (a). According to the probation report, the incident occurred because defendant "was involved in a verbal dispute . . . over money" with [Maurice Rem, the victim,] a five-year-old.[5] Defendant "punched the victim once in the head as he tried to walk way," "[t]he victim fell to the ground and struck his head on the pavement," defendant "fled from the scene bragging about how she knocked the victim out," and two days later the victim died from a subdural hematoma.  As part of the plea agreement, a voluntary manslaughter count was dismissed.  Defendant was sentenced in case number BA387255 to state prison for a

---

[5]    We grant defendant's request that we take judicial notice of the Attorney General's April 28, 2014, letter to us.  In that letter, the Attorney General stated that the Los Angeles County District Attorney's Office advised the Deputy Attorney General that the probation report was inaccurate in that regarding case number BA387255, Rem, the victim, was likely 55 years old, not five years old, at the time he was assaulted by defendant and died.

term of seven years, consisting of the upper term of four years for the offense and three years for the enhancement. Apparently, she had previously been the victim of a sexual assault.

Defendant's counsel asked the trial court to concurrently sentence defendant in the instant case with the sentence in BA387255. Defendant's counsel stated that defendant told a detective involved in case number BA387255 that defendant had previously been raped, and defendant "freaked out" when the victim in that case "laid his hands on her."

In response to the trial court's inquiry, defendant's counsel advised the trial court that the assault in case number BA387255 occurred about three or four months prior to the incident involved in the instant case. The prosecutor advised the trial court that the police had been searching for defendant at the time of the incident involved in this case occurred.

The trial court stated, "The court is very concerned about the level of violence. I think [defendant] did get the benefit of having been a victim of a sexual assault she got the benefit of a plea to a nonmurder charge or she got the benefit of a [section] 245 in the agreement even though somebody died. [¶] . . . [¶] [B]ased upon the violence as I indicated my concerns were and also the time it happened very close in time to one another, escalating violence, the court is going to exercise its discretion and run the sentences consecutive to one another."

###    4.    *Analysis*

Defendant argues that it was not appropriate for the trial court to base its decision to impose on her consecutive sentences on the favorable plea agreement defendant received in the unrelated matter—case number BA387255. Defendant has not provided any authority that a trial court is forbidden from considering the kind of sentence a defendant received for the first crime, and we are aware of none.

Defendant further argues that she did not receive an "excessive" benefit when she agreed to the seven year sentence in case number BA387255 because defendant had previously been raped, and she overreacted to being touched by the victim in that case.

27

The probation report stated that the incident concerning case number BA387255 "involved . . . a verbal dispute . . . over money" with the victim, with defendant ultimately punching the victim once "in the head as he tried to walk way," causing him to fall to the ground and strike his head on the pavement. According to the probation report, defendant "fled from the scene bragging about how she knocked the victim out," and two days later the victim died from the injuries he sustained in the confrontation. The trial court reasonably could infer that defendant received a benefit when she agreed to the seven year sentence in case number BA387255 given that the victim died.

Defendant contends that the trial court did not exercise informed discretion because the probation report regarding case number BA387255 erroneously referred to the victim in that matter as being 5 years old instead of 55 years old. There is no indication that the age of the victim in case number BA387255 was a factor considered by the trial court in imposing consecutive sentences.

Defendant also contends that she is being "effectively punished[d] [in the instant case] for conduct engaged in primarily by Parker." Defendant states that "it is unclear from the evidence whether [she] gave Parker a knife. One [therefore] cannot tell if the jury reached that conclusion . . . ." As discussed above however, the prosecutor's legal theory of the case was premised on the factual theory that defendant provided Parker with a knife that he used to kill Brown. Defendant, therefore, was punished for her actions in providing Parker with a knife with the intent that it be used fatally or in a way that a reasonable person would have understood was likely to have fatal consequences, not for Parker's actions. The record therefore reflects that defendant was not deterred from her conviction of her prior act of violence and has shown a willingness to reoffend.

In the unrelated matter, defendant struck someone who died, and there is no indication that defendant's action was an overreaction to having been a victim of rape. Here defendant was convicted of murder by handing a knife to a person engaged in a fight. The trial court did not abuse its discretion in providing for consecutive sentences.

28

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.

MOSK, Acting P.J.

We concur:

KRIEGLER, J.

GOODMAN, J.[*]

_____

[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.